MORLEY & MOREHOUSE RAILROAD COMPANY et al., Plaintiffs in Error, v. JOHN HIMMEL-BERGER et al.

Division One, December 24, 1912.

1. SUPPLEMENTAL CONTRACTS: Construction. A note, contract, supplemental contract, assignment and deed of trust, made upon the same day and concerning the same subject-matter, must be read and construed together as parts of the same transaction where by their express terms they constitute one single agreement.

Railroad v. Himmelberger.

2. **CONTRACTS: Construction: Freight Rates.** Certain freight rates were guaranteed to defendant's assignor by the plaintiff railroads, with the provision that his assignee should have the right to ship under those rates its own freight and that of any manufacturing firm or corporation in which it might own stock. The assignor bound himself and his assigns to furnish freight worth $5000 a year in earnings for five years, and by a supplemental agreement the assignee bound itself, as far as practicable, to give the plaintiff railroads the preference on all shipments of freight made by it from or to a certain point. *Held*, that the assignee is not liable in damages for failing to procure for the railroad the preference in freight beyond $5000 a year from a corporation in which the assignee was interested.

3. ————: ————: ————: **Subsequent Reference.** By part "a" of section 5 of an agreement settling freight rates between plaintiff railroads and defendant's assignor certain specified rates were guaranteed to the assignor on freight from point A to points B, C and D, and part "d" of the same section read, "rates on the same basis to and from other points on said railroad." *Held*, that a subsequent reference in the agreement to "rates as aforesaid" includes the provisions of part "d" as well as of part "a."

4. ————: ————: ————: **Lowering Contract Rate.** An agreement fixing freight rates and regulating the hauling of freight required the application of the proceeds of certain freight charges to the payment of a debt, and a provision of the agreement says specifically that lower than contract rates, if given, shall not affect any part of the agreement. *Held*, that a reduction of the rate on one kind of freight covered by the agreement does not avoid the necessity of applying the proceeds from hauling that freight to the payment of the debt.

5. ————: ————: ————: **Time of Payment of Debt.** Defendants' assignor lent the plaintiffs, owners of railroad lines, money to build an extension line. The contract entered into when the money was lent provided that the party furnishing the money, or his assigns, was to ship, for five years from the date of a note mentioned (which the parties knew was made and dated that same day), sufficient freight to produce earnings amounting to $5000 each year, half of which sum was to be applied each year to the payment of the said note evidencing the debt. *Held*, that the five-year period began to run at the date of the note, and not at the time of the completion of the extension line.

6. **EVIDENCE: Judicial Notice: Constructing Railroad.** The Supreme Court cannot take judicial notice of the time reasonably necessary for the construction of a railroad.

7. **CONTRACTS: Construction: Payment: Sum Certain Each Year.** An agreement to furnish freight to plaintiff railroad companies in such quantities that one-half the total earnings thereon should "amount to not less than $2500 each and every year for five years," which sum was to be applied upon a note executed by the railroads to the shipper, meant that $5000 in freight earnings must be furnished each year, and the excess in two of the five years cannot be credited on deficiencies in previous years.

8. ————: ————: ————: ————: **Note: Credit.** Defendants' assignor lent money to the plaintiff railroad companies and agreed to furnish them freight in such quantities that one-half the total earnings thereon should amount to not less than $2500 each and every year for five years, which sum was to be applied upon the note evidencing the debt, the note providing that it was to be paid as in said contract specified and not otherwise. *Held*, that a deficiency resulting from a failure in a certain year to furnish the requisite amount of freight must be credited on the note up to the amount of $2500.

9. ————: ————: **Freight Rates: Railroad's Failure to Furnish Cars.** Where shippers agreed to furnish the plaintiff railroad companies freight in such quantities that one-half the total earnings should amount to $2500 each year, which sum was to be applied upon a note executed by the companies, a deficiency resulting from a failure to furnish the requisite amount of freight in a certain year due to the failure of the railroads to furnish cars should not be credited on the note.

10. ————: ————: **Note: Sale of Interest in Property by Maker: Liability.** Defendants' assignor lent money to the plaintiff railroad companies and agreed to furnish them freight in such quantities that one-half the total earnings thereon should amount to not less than $2500 a year, which sum was to be applied upon the note evidencing the debt, said note providing that it was to be paid as in said contract specified and not otherwise. *Held*, after elimination of plaintiff's claim for damages for breach of contract, that the sale of their railroad by the plaintiff companies would not take away their right to a credit on the note for a deficiency in freight furnished them.

11. **APPEAL: Issues: Not Raised by Pleadings.** Issues not raised by the pleadings need not be considered by the Supreme Court.

Appeal from Cape Girardeau Court of Common Pleas.—*Hon. Benjamin F. Davis*, Judge.

AFFIRMED (*conditionally*).

*John A. Hope, Giboney Houck, R. G. Ranney* and
*M. R. Smith* for plaintiffs in error.

*Oliver & Oliver* and *Brown, Geddes, Schmettau
& Williams* for defendants in error; *R. B. Oliver* and
*Clarence Brown* of counsel.

BLAIR, C.—This is a suit to cancel a note and
deed of trust and for damages for breach of a contract
to furnish freight to be transported by plaintiff rail-
roads.

July 1, 1897, Stephen B. Hunter entered into a
written agreement with the Morley & Morehouse
Railroad Company, Houck's Missouri & Arkansas
Railroad Company and Louis Houck whereby he un-
dertook to furnish $20,000 for the purchase of railroad
materials, payment to be made on delivery of the rails,
etc., to the Morley & Morehouse Railroad Company.
The two railroad companies and Louis Houck agreed
to execute the following instrument:

"Five years after date we promise to pay to
Stephen B. Hunter the sum of twenty thousand dol-
lars with eight per cent interest per annum from date,
all interest payable annually, for value received.

"This note is made in pursuance of a contract
entered into on the first day of July, 1897, between
the said Stephen B. Hunter and the Morley & More-
house Railroad Company, Houck's Missouri & Arkan-
sas Railroad Company and Louis Houck, and interest
and principal is to be paid as in said contract specified
and not otherwise and the said contract is hereby de-
clared to be a part and parcel of this note."

The Morley & Morehouse Railroad Company fur-
ther agreed to execute to Hunter a trust deed on the
proposed line from Morley to Morehouse, and as ad-
ditional security Louis Houck agreed to deposit in a
named bank $20,000 in the bonds of Houck's Missouri
& Arkansas Railroad. By section five of the agree-

ment, in consideration of the advance of money made, certain specified freight rates were guaranteed to Hunter and his assigns: (a) on lumber and all other manufactured forest products from Morehouse to Cape Girardeau, East Cape Girardeau and Commerce; (b) on logs and spoke butts from any point on the Morley & Morehouse Railroad, Hunter and his assigns to have the right to haul logs with their own engines and cars at the same rates; (c) on ties and piling to Cape Girardeau and Commerce, coupled with a covenant to give rates on these articles as low as given any other shipper; (d) "Rates on the same basis to and from other points on said railroad, and on other timber and lumber shipped not enumerated."

These rates were stated to constitute part of the consideration for the advancement of the $20,000 and to be of the essence of the contract and to this provision was added: "But nothing herein shall be so construed as to prevent the said party of the second part from making a lower rate to the said party of the first part, if they so desire, and if said rates are so made this shall not be construed as in any way or manner abrogating, canceling or nullifying this contract or any part thereof."

It was also stipulated that Hunter might "transfer his rights as to the said freight rates" under the contract and that his assignee should have the right to ship under contract rates his own freight and that of any manufacturing firm or corporation in which he owned stock or had an interest.

Section eight reads as follows:

"8th.  The said party of the first part, for five (5) years from the date of the note aforesaid, hereby agrees, contracts and binds himself, unless prevented by fire or other unavoidable accident to give, furnish and deliver, or cause to be done by others, to whom he may assign or transfer his rights hereunder, to the said Morley & Morehouse Railroad Company and the

said Houck's Missouri & Arkansas Railroad Company, at Morehouse and other points along said Morley & Morehouse Railroad, freight to be handled by said railroad companies and hauled by them on their said lines, and that one-half of the total earnings on the said freight so furnished under rates as aforesaid, shall amount to not less than twenty-five hundred dollars each and every year for five years and it is distinctly agreed that the said one-half of said total earnings on said freight, shall be applied each year, first to the payment of interest on the said twenty thousand dollars, and the balance to the reduction of the principal.

"It is further agreed that monthly settlements shall be made for and on account of the said one-half of said freight earnings and that between the first and tenth of each month the said one-half of the said freight earnings shall be paid over by the said party of the second part to the party of the first part at once and by the said party of the first part at once applied to the payment of said interest and principal of said note *pro tanto,* but in case of the inability from any unavoidable cause of said party, or its assigns to cause to be furnished the amount of freight as above promised, then he agrees to take first mortgage bonds on the said Houck's Missouri & Arkansas Railroad at their market value in an amount sufficient when added to one-half of the earnings of freight furnished by him or his assigns as above provided at the end of each year to the amount of twenty-five hundred dollars per annum."

Other stipulations follow which it is unnecessary to set out in this connection.

On the same day the railroad companies and Louis Houck executed the so-called note in form as agreed in the contract. Simultaneously with the execution of the contract and note, a supplemental agreement was signed by I. Himmelberger & Company, and all the

parties to the first mentioned contract and note, which
was by its terms made a part of the first mentioned
contract and recited that Hunter, with the knowledge
of all parties, executed that contract for and in behalf
of I. Himmelberger & Company, and as a convenience
to the railroad companies, Louis Houck and I. Him-
melberger & Company. By this agreement Hunter
bound himself to transfer and assign his rights to I.
Himmelberger & Company and that company by virtue
of such assignment was to acquire all rights and as-
sume all liabilities under the contract so assigned, "as
fully and perfectly as if said I. Himmelberger & Com-
pany had been named in said contract."

Further provisions read thus:

"And it is further agreed by and between all the
parties to this contract and agreement that the said I.
Himmelberger & Company by virtue of said transfer
and assignment to them and in order to enable said
railroad companies and Louis Houck to repay the said
sum of twenty thousand (20,000) dollars, so ad-
vanced, as in said contract set out, as far as practica-
ble, agree, contract and undertake to give the said
Morley & Morehouse Railroad Company and said
Houck's Missouri & Arkansas Railroad Company the
preference on all shipments of freight made by them,
or received by them, from and to Morehouse or other
points along said proposed railroad, or extension
thereof, over any and all of the routes of railroad in
all cases where the said Morley & Morehouse Railroad
Company and Houck's Missouri & Arkansas Railroad
Company shall and will carry or cause to be carried
by other lines such freight to or from any desired
place or point of destination with equally as good ad-
vantages to said shipper, said I. Himmelberger & Com-
pany, and at the same or lower rate than such other
competitive line or lines may make or establish.

"It is also agreed by the parties hereto that al-
though this agreement and contract is detached from

the agreement and contract entered into between Stephen B. Hunter and the Morley & Morehouse Railroad Company, Houck's Missouri & Arkansas Railroad Company and Louis Houck, yet in fact it is a part of said contract made contemporaneous with said contract and is only detached from said contract upon the request of said I. Himmelberger & Company, said railroad companies and said Louis Houck for the reason that they do not desire the name of I. Himmelberger & Company to appear in said contract.''

Other paragraphs guaranteed Hunter protection from liability in connection with the transaction.

Hunter assigned the note and contract to I. Himmelberger & Company and the Morley & Morehouse Railroad Company executed its deed of trust as agreed. All these instruments and assignments bore date July 1, 1897, and were executed and delivered at the same time and as parts of a single transaction.

The M. & M. R. R. Co. then commenced the construction of the line, completing it in December, 1897. I. Himmelberger & Company was a partnership composed of I. Himmelberger (now deceased) and the defendant John H. Himmelberger. The partnership owned timber lands near Morehouse and held stock in the Himmelberger-Luce Land & Lumber Company and the Himmelberger-Harrison Land & Lumber Company, which corporations were engaged in the manufacture and sale of lumber at Morehouse and owned timber lands in that vicinity. In 1897 the St. L., I. M. & S. Ry. was the only railroad with a line passing through Morehouse and the Himmelbergers were desirous of securing a competing line for the benefit of the industries in which they were interested. Houck's M. & A. R. R. extended from Commerce to Morley and the plan to build a line from Morley to Morehouse originated with I. Himmelberger and Louis Houck.

After the completion of the road to Morehouse the Himmelberger-Luce Land & Lumber Company

shipped much of its output over that line and also shipped over the St. L., I. M. & S. Ry. There is evidence that during 1899, 1900 and 1901 the M. & M. R. R. failed to furnish cars in reasonable numbers and in reasonable time and that for these reasons it was necessary to send shipments over the St. L., I. M. & S. Ry., which were intended for the M. & M. R. R.

Some time during the five year period fixed by the contract it was arranged that the Himmelberger-Luce Land & Lumber Company's freights should be sent as if prepaid, a plan subsequently abandoned. It appeared that the M. & M. R. R. Company became indebted to Himmelberger-Luce Land & Lumber Co. on accounts other than the note and it seems to be conceded these claims have been paid.

Louis Houck owned practically all the stock in both railroad companies and his counsel declared on the trial he "absolutely dominated" both roads.

The petition sets up the contracts, note and deed of trust, alleges that I. Himmelberger & Company violated their agreement to furnish freight sufficient to produce earnings to the amount of $5000 per year for the five-year period fixed by the contract and prays damages therefor; alleges I. Himmelberger & Company bound themselves by the contract to cause all freight of companies and corporations in which they had stock or interest to be shipped over the M. & M. R. R.; alleges the shipment of large quantities of freight by such companies over the St. L., I. M. & S. Ry., demands damages therefor to the extent of $100,000 and prays that the note and deed of trust be cancelled.

The Himmelberger Realty Co., to which the note had been assigned, answered admitting its ownership of the note and the existence of the deed of trust and averring that certain credits had been given on the note and that there was a balance due for which it prayed judgment.

Defendant John H. Himmelberger in his answer averred that the plaintiff railroad had sold its claim for damages, if any it had, and had no interest therein; denied any violation of the contract and set up several matters of defense.

The court rendered judgment against plaintiffs on their petition and gave judgment for the Realty Company on the note in the sum of $7144.90. From this judgment plaintiffs appealed.

I. The note, contract, supplemental contract, assignment and deed of trust must all be read and construed together as parts of the same transaction. According to their express terms they constitute one single agreement.

II. On the count for damages for the alleged failure of I. Himmelberger & Co. to secure for the railroad company preference, by the Himmelberger-Luce Land & Lumber Company, in shipments in excess of freight sufficient to produce earnings of $5000 per year during the contract period, plaintiffs were not entitled to recover and the trial court was right in so holding. The contract guaranteed Hunter's assignee the right to ship or cause to be shipped, under the rates specified, ''any freight belonging either (1) to it or (2) any manufacturing firm or corporation in which said assignee or assignees or any of them shall have and own stock or have any interest'' and, as Hunter's assignee, the firm of I. Himmelberger & Company bound itself, absolutely, to furnish or cause to be furnished sufficient freight to produce earnings amounting to $5000 per year for five years. This part of the agreement, however, does not relate to the obligations assumed by I. Himmelberger & Company to give plaintiff railroads preference with respect to other and additional shipments. That obligation arises under what we have termed the supplemental agreement which

provides that "I. Himmelberger & Company. . . . as far as practicable, agree, contract and undertake to give the said Morley & Morehouse Railroad Company and Houck's Missouri & Arkansas Railroad Company the preference on all shipments of freight made by *them* or received by *them,* from and to Morehouse," etc. This provision relates solely to shipments by I. Himmelberger & Co. and none other. In connection with the part of the agreement binding I. Himmelberger & Co., absolutely, to furnish a prescribed quantity of freight each year during the five-year period it was specially provided that firm might discharge that obligation by furnishing shipments of its own *or* of companies or corporations in which it held stock or had an interest. No such provision is found in connection with that part of the contract on which the count now under consideration is based. In fact correspondence in the record indicates the refusal of the firm of I. Himmelberger & Company to agree to extend the preference agreement to other shipments than its own. However, ambiguity is the key which unlocks the door to explanatory evidence and the language of this provision of the contract carries none.

III.  On the count for damages for breach of the agreement to furnish freight sufficient to produce in earnings at least $5000 per year for five years the trial court held that the five-year period began July 1, 1897, and ended July 1, 1902, and found that the earnings on freight furnished the first year were $2560.46; second year, $5166.34; third year, $4653.87; fourth year, $6235.59; fifth year, $4832.56; a total for the five years of $23,448.82. The court held that the agreement, properly construed, was one to furnish during the five years, sufficient freight to produce $25,000 in earnings during the entire period and that judgment for the deficiency of $1551.18 could not be given since no evi-

dence of the profits which would have accrued was offered.

1. In arriving at the total freight earnings for which credit on the agreement to furnish $5000 per year for five years was given defendants, the trial court allowed some items to which plaintiffs object. (1) It is contended no freight should have been included save on shipments from Morehouse to Cape Girardeau, East Cape Girardeau and Commerce and points beyond. It is argued the contract provides that "one-half of the total earnings on said freight so furnished under rates as aforesaid shall amount to not less than twenty-five hundred dollars each and every year for five years;" that the *"rates as aforesaid"* are those prescribed by section five of the contract and that since Morehouse is the only point of origin and Cape Girardeau, East Cape Girardeau and Commerce are the only destination points mentioned, "freight so furnished *under rates as aforesaid*," is limited to freight originating at Morehouse and destined to one of the three named points or beyond. The argument overlooks paragraph "d" of section five of the contract which established "Rates on the same basis to and from other points on said railroad, and on other timber and lumber shipped not enumerated." This last quoted clause rendered the point of origin of shipments immaterial and included shipments destined to any point on plaintiff roads or beyond and the trial court was right in so holding. (2) It is also insisted that shipments of "gum strips" from Morehouse to Commerce made under a special lower rate were not, therefore, made under the contract rates, and freight earnings on these shipments ought not to have been included by the court in its totals. Again plaintiffs have overlooked a contract provision. Section seven specifically provides that lower than contract rates may be given but if given shall not otherwise affect the contract "or any part thereof."

By force of this clause the granting of the lower rate had no other effect than to substitute the new rate for the old, leaving the contract otherwise unaffected. The ruling of the trial court was corrrect.

2. Defendants contend that the five-year period during which I. Himmelberger & Company agreed to furnish plaintiff roads sufficient freight to produce earnings to the amount of $5000 per year began at the time the road was opened for business and not at the date of the note. Otherwise, it is said, plaintiff roads might have delayed the completion of their line for an entire year and yet have claimed credit for earnings on the freight I. Himmelberger & Company contracted to furnish during that period. That this last could not be true is manifest and from that it is argued it must follow that any delay after July 1, 1897, in opening the road for business, of itself set forward by that much the beginning of the five-year period.

We think the conclusion does not follow from the premise stated. The contract provides that the second party is to ship, for five years from the *date of the note,* sufficient freight to produce earnings amounting to $5000 each year, and there is nothing in the contract itself to the contrary. The provision in section five of the contract guaranteeing the contract rates for five years after the opening of the road would extend the period during which the contract rates were to be in force beyond July 1, 1902, by a period equal to that between the date of the note and the date of the opening of the road but would not otherwise affect the agreement to furnish a given amount of freight per year for five years after the date of the note, there being nothing else in the contract indicating an intent to change or qualify the last mentioned agreement. The contract clearly contemplated some delay in opening the road because the $20,000 loaned the railroad company was, as the contract expressly states, loaned for the purpose of purchasing rails, etc., to build the

road. The parties knew no road existed when the contract was made and knew that it requires time to build railroads. They know, also, that the date of the note was July 1, 1897, and with all this in mind I. Himmelberger & Company agreed to furnish *each year* for a period of five years *from the date of the note* freight sufficient to produce earnings of $5000 per year. Under these circumstances the five-year period began to run at the date of the note and the railroad company had a reasonable time in which to construct its line. There is neither allegation in the pleadings nor suggestion in the evidence to the effect that more than a reasonable time elapsed after July 1, 1897, before the road was opened, and we cannot take judicial notice of the time reasonably necessary for the construction of a railroad. In this condition of the record the trial court's holding that the five-year period began July 1, 1897, the date of the note, must be upheld.

3. By the contract I. Himmelberger & Company bound themselves to furnish freight in such quantities that one-half the total earnings thereon should "amount to not less than twenty-five hundred dollars *each and every year* for five years" and this obligation could not be satisfied by anything save compliance with its plain terms. The furnishing of no freight the first year and twice the required amount the second, for instance, would not have carried out the agreement. There would have been a material difference between the effect on accruing interest of credits of $2500 in each of the years of 1897-1898 and 1898-1899 and a credit of $5000 in the year 1898-1899. The contract does not provide that $25,000 in freight earnings is to be furnished in five years but, in effect, that $5000 must be furnished "each and every year" for five years. The excess furnished in two of the years in the five-year period cannot be credited on deficiencies in previous years. The provision in section eight to the effect that "it is distinctly agreed that the said

one-half of said total earnings on said freight shall be applied each year, first to the payment of interest on the said $20,000, and the balance to the reduction of the principal" is another which clearly imports that the earnings of each year of the five years are to be separately considered.

4. The provision that in case of the inability of Hunter or his assigns, from any *unavoidable* cause, to cause to be furnished for five years $5000 per year in freight earnings, that he or his assigns would at the end of any year accept certain bonds to an amount sufficient, when added to one-half the freight earnings, to total $2500 for that year, could become operative only when a deficiency arose from an unavoidable cause and no evidence of such a situation was offered. Neither did this clause convert this portion of the contract into a mere alternative agreement to furnish freight in the agreed amount or suffer payment to be made in bonds. In view of what is said in a subsequent paragraph as to the deficiency in the year 1899-1900 it may be observed now that if this clause could be construed to include as an "unavoidable cause," the inability of the railroad to furnish cars, yet no tender of bonds was made at the end of the year mentioned or other time.

5. Under the findings of the trial court and the evidence the earnings on the freight furnished during the year beginning July 1, 1897, and ending July 1, 1898, amounted to $2560.46 and under the contract the deficiency for that year amounted to $2439.54. Plaintiffs contend the trial court erred in refusing to credit the note with the amount of this deficiency.

The note expressly refers to the contract for the manner of payment and the contract includes the agreement that at least $2500 is to be paid out of one-half the earnings on freight furnished during the year 1897-1898. The principle relied upon by plaintiffs is

that announced in Knettle v. Scott, 18 Mo. App. 412; Wilt v. Ogden, 13 Johns. 56; Nipp v. Diskey, 81 Ind. 214; McClellan v. Coffin, 93 Ind. 456; Bettle v. Bank, 3 N. Y. 88; Smith v. Corn, 3 Head, 116; Webb & Webb v. Vermillion, 13 Ky. Law Rep. 367. These were cases in which either the payor had an option to pay in services and was prevented by the payee from exercising it, or the contract, in whole or in part, was to be discharged solely by certain services agreed to be rendered. The agreement in this case falls within neither of the classes mentioned. Here the contract is to pay money. That a portion of the money is to be derived from freight to be furnished does not convert the agreement into one to pay in transportatiton.

The note, however, refers to the contemporaneous contract and expressly provides it "is to be paid as in said contract specified *and not otherwise.*"

Section eight of the contract, when construed with the concurrent supplemental agreement, obligates I. Himmelberger & Company to furnish freight the earnings on which will amount to at least $5000 per year and provides for the payment of the note out of such earnings to the extent of one-half thereof each year for five years. The contract therefore provides for a fund out of which a certain part of the note is to be paid and the note expressly provides it "is to be paid as in said contract specified and *not otherwise.*" A promise to pay out of a particular fund and not otherwise is contingent and unenforceable except in accordance with its terms (Story on Promissory Notes [7 Ed.], sec. 25; Daniels on Negotiable Instruments, sec. 50) and defendants having breached their covenant to provide the means for accumulating the fund out of which it was agreed payment to a prescribed extent should be made *or not made at all* have no reason to complain of the application of the rule in this case. The suggestion that the agreement was merely

one to furnish employment out of the profits of which payment might have been made and its breach gave rise to an action for damages only and not to a right to a credit on the note is not sound as to one-half the deficiency. The language of the note and contract refutes it.

The agreement as to payment from the earnings related, however, to but one-half of them and to that extent only can the credit be allowed. There was no obligation to pay over more than one-half the earnings and payment from the particular fund was to be made to the extent of but one-half of them. One-half such earnings constituted the fund designated. As to the other half the breach by I. Himmelberger & Company of their agreement might have entitled plaintiffs to damages to the extent of probable profits but no evidence having been given of what profits would have accrued recovery therefor was properly denied. So far as concerns the deficiency in freight furnished between July 1, 1899, and July 1, 1900, the evidence, we think, shows it to have been due to the failure of plaintiff roads to furnish cars and no credit can be allowed on that account. Nor can any credit be allowed on account of the deficiency in the last of the five years, the contract rates having been abrogated a few days before the end of that year.

6. Defendants contend plaintiffs have sold the road and with it their cause of action, if any, on the contract, and consequently are not entitled to the credit claimed by reason of the deficiency in freights furnished the first year. In the view we have taken the question whether plaintiffs' causes of action on the contract passed by the deed to the St. Louis & Gulf Railroad Company is no longer in the case. No recovery of damages was permitted below and what has been said results in an affirmance of the judgment to that extent. There could be no claim that plaintiffs' *liability to pay* any balance due on the note was in-

creased or diminished by the execution of the deed mentioned. After the elimination of the claims for damages for breaches of the contract this became, in effect, a suit against plaintiffs on the note. Certainly the deed to the St. Louis & Gulf, whatever its effect as to rights of action for breaches of the contract, could not erase a credit from the note, and how can it be any more successfully asserted that it could destroy a credit, though unendorsed, which plaintiffs under the law were entitled to have endorsed on the note? The deed mentioned in no wise affected the rights of plaintiffs to the credit for one-half the deficiency in freight earnings for the first year.

IV. So far as concerns the claim for credits for the amount of the earnings on freight now asserted to have been shipped as "prepaid" by the Himmelberger-Luce Land & Lumber Company under an agreement that one-half should be applied on the note and one-half remitted to the railroad company, it is only necessary to say that neither the petition nor reply raises any such issue in this case. The right of plaintiffs and the company mentioned to alter the contract between plaintiffs and I. Himmelberger & Company without the latter's consent might well be questioned but need not be discussed since the issue was not made. Had the issue been made and the matters tried below it might have appeared and in fact the record indicates it would have appeared the sums arising from such payments were diverted, with plaintiffs' assent, to the payment of other debts owing to the Lumber Company.

V. Other questions are suggested in the briefs, but in view of what has been said are no longer of importance. The judgment rendered was for the sum of $7144.90. In arriving at this amount the court failed to include a credit for one-half the difference

between $5000 and the earnings on freight furnished between July 1, 1897, and July 1, 1898.    Allowing credit for this amount ($1219.77) as of July 1, 1898, judgment should have been rendered for $4893.97, and the judgment entered was excessive to the extent of the difference.   The judgment will be affirmed on con- dition that a remittitur of $2250.93 is entered as of the date of the judgment in the trial court, otherwise the judgment will be reversed and the cause remanded. *Brown, C.,* concurs.

· PER CURIAM.—The foregoing opinion of BLAIR, · C., is adopted as the opinion of the court.   All the judges concur.